**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| **JOHN J. ELEY,** | ) | **CASE NO.  4:02CV1994** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| **v.** | ) | |
| | ) | |
| **MARGARET BAGLEY, Warden,** | ) | **OPINION AND ORDER** |
| | ) | |
| **Respondent.** | ) | |


**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court upon petitioner, John J. Eley's ("Eley"), Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF DKT # 34).  Eley filed the Petition challenging his conviction and sentence of death rendered by an Ohio court.  The Respondent, Margaret Bagley, Warden, filed a timely Return of Writ and Eley filed a Traverse.  For the following reasons, the Petition for Writ of Habeas Corpus is hereby denied.

**I.  Factual History**

1

On September 22, 1986, a Mahoning County Grand Jury issued a three count indictment against Eley.  Count one charged Eley with purposely causing the death of Ihsan Aydah while committing or attempting to commit aggravated robbery in violation of Ohio Revised Code § 2911.01(A)(1)(2).  This count carried with it a specification that he was the principal offender in the murder and robbery and a firearm specification.  Eley was also charged with aggravated robbery in violation of Ohio Revised Code § 2913.01 and conspiracy to commit aggravated robbery in violation of Ohio Revised Code § 2923.01(A)(1)(2).  Both counts two and three carried firearm specifications.

Although Eley initially entered a plea of not guilty by reason of insanity, he later withdrew that plea and entered a plea of not guilty.  Eley waived his right to a jury trial and was tried before a three-judge panel.

In its consideration of Eley's direct appeal, the Ohio Supreme Court set out the factual history of this case, as revealed by the evidence adduced at Eley's trial.  The facts surrounding the underlying incident are as follows:

> On August 26, 1986, defendant-appellant, John Jeffrey Eley, shot and killed Ihsan "Easy" Aydah during a robbery of the Sinjil Market in Youngstown, Ohio. Eley confessed to the killing, and was subsequently convicted of aggravated murder and aggravated robbery, and sentenced to death.
>
> During the early afternoon of August 26, 1986, Eley was visiting Melvin Green at the home of Green's girlfriend in Youngstown. According to Eley, he and Green were just sitting around when Green suggested that they go down to the "Arab store." Eley and Green left the house and proceeded down a path through the woods leading to the Sinjil Market. Along the way, Green showed Eley a "Black Snub nose gun," and told Eley he "was going to take the Arab off." Since the proprietor of the store, Ihsan Aydah, knew Green's face, Eley agreed to go in alone and rob the store while Green waited outside.
>
> Eley entered the store and told Aydah to put his hands up and to turn and face the wall. Green had told Eley that Aydah had a gun under the store counter, so

2

when Aydah lowered his hands and went under the counter, Eley fired a shot. Eley claimed that he aimed at Aydah's shoulder. However, the shot hit Aydah on the right side of his head, approximately four inches above the earlobe. Aydah died the next day of shock and hemorrhage due to a gunshot wound to the head.

Just before Eley fired the gun, Green entered the store. After the shot, Green ran behind the counter and got into the cash register. He took Aydah's wallet while Aydah lay wounded on the floor. As the two left the store, Green gave Eley a brown paper bag with the money and wallet. According to Eley, they went up the street, "got to the path and ran up the woods."

Around 2:00 to 2:30 p.m. that day, Cheryl E. Cooper left home for the Sinjil Market with her three children. Cooper saw Melvin Green and another man enter the path to the store "walking fast in front of us." Cooper saw the pair turning the corner heading to the store, and noticed that neither man was carrying anything at that time. Shortly thereafter, Cooper saw Melvin Green and the other man, who was carrying a brown paper bag, come around the corner, passing them halfway on Davis Lane. When Cooper arrived at the Sinjil Market, she saw magazines and cigarettes strewn all over the floor. She looked over the counter and saw Aydah lying on the floor.

Christopher Cretella lived half a block from the Sinjil Market, and around 2:30 p.m. that day was outside washing a car in his driveway. He saw Melvin Green and "another fellow" walking away from the store, and then running toward the path, right into the woods. Cretella noticed the pair holding a bag and passing something back and forth. Two weeks before the murder, Cretella had seen Green and Aydah "[having] some words," and "Easy told him to get out and not to come back."

Several days after the murder, Eley was arrested by Youngstown police at the residence of his cousin's girlfriend, Carlotta Skinner. After his arrest, Eley told police that he and Green had split the money taken in the robbery, which was around $700. However, Eley later gave the money back to Green "because he said it was all on him and he had to get out."

*State v. Eley*, 77 Ohio St.3d 174, 174-175 (1996).

## II. <u>Procedural History</u>

Prior to trial, Eley filed a motion to suppress his confession, alleging that police had

obtained it in violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

The trial court denied the motion, finding that Eley's waiver of his rights at the time of the confession was knowing, voluntary, and intelligent.

The trial commenced on May 11, 1987, before a three-judge panel and concluded the following day.  The panel found Eley guilty of aggravated murder, aggravated robbery, the felony-murder specification and two of the three firearm specifications.  The panel acquitted Eley on the conspiracy charge.

The panel then proceeded with the mitigation hearing.  At this hearing, defense counsel called Eley's mother, sister, and several other family members to testify on Eley's behalf.  Defense counsel also adduced testimony from Dr. Douglas Darnell, a clinical psychologist.  Eley also made a short, unsworn statement.  The panel unanimously found that the aggravating circumstance outweighed the mitigating factors and sentenced Eley to death on July 14, 1987.  It also imposed a 10-25 year sentence for the aggravated robbery and a three-year fixed sentence for the firearm specification, each to run consecutively.

Initially, appointed counsel E. Winther McCroom and Thomas Zena represented Eley on his direct appeal to the Seventh District Court of Appeals.  On January 30, 1991, the Seventh District, on its own motion, removed counsel and appointed the Ohio Public Defender ("OPD") to represent Eley before that court.  Appellate counsel Linda E. Prucha and William C. Kollar from the OPD raised seventeen assignments of error.   The Seventh District Court of Appeals affirmed the trial court's judgments on December 20, 1995.  *State v. Eley*, No. 87 CA 122, 1995 WL 758808 (Ohio Ct. App. Dec. 20, 1995).

Eley filed a timely appeal to the Ohio Supreme Court, raising eighteen propositions of law.  The Ohio Supreme Court affirmed the convictions and death sentence.  *State v. Eley*, 77

4

Ohio St.3d 174 (1996).  Eley filed a petition for a writ of certiorari to the United States

Supreme Court.  The Court denied the petition.  *Eley v. Ohio*, 521 U.S. 1124 (1997).

On September 20, 1996, Eley filed a petition for post-conviction relief pursuant to

Ohio Revised Code § 2953.21 in the Mahoning County Court of Common Pleas, alleging

thirteen claims for relief.  Eley filed a motion for a competency hearing on January 23, 1997.

The post-conviction court conducted an evidentiary hearing on the competency issue.  After

reviewing briefs the parties submitted, the post-conviction court denied Eley's motion for a

competency determination because Eley had no right to be competent in a post-conviction

proceeding.  On April 1, 1999, the post-conviction court issued its findings of facts and

conclusions of law denying Eley post-conviction relief.  *State v. Eley*, No. 86 CR 484, slip op.

(Ohio Ct. Common Pleas Apr. 1, 1999).

Eley filed a timely notice of appeal to the Seventh District Court of Appeals.  He

alleged two assignments of error.  Eley attempted to withdraw his appeal to the Seventh

District Court of Appeals by *pro se* motion to that court.  He subsequently revoked his motion

and proceeded with the appeal.  On November 6, 2001, the Seventh District Court of Appeals

affirmed the trial court's dismissal of Eley's post-conviction petition.  *State v. Eley*, No. 99

CA 109, 2001 WL 1497095 (Ohio Ct. App. Nov. 6, 2001).

Eley filed a memorandum in support of jurisdiction with the Ohio Supreme Court,

raising two propositions of law.  The Ohio Supreme Court declined to exercise jurisdiction on

March 20, 2002.  *State v. Eley*, 94 Ohio St.3d 1506 (2002).

Eley filed a successor petition for post-conviction relief on June 9, 2003, alleging that

he was mentally retarded and could not be executed based on the United States Supreme

Court's holding in *Atkins v. Virginia*, 536 U.S. 304 (2002).  Eley then filed a motion to dismiss his successor petition for post-conviction relief.  The post-conviction court granted the motion on January 5, 2005.  *State v. Eley*, No. 86 CR 484 (Ohio Ct. App. Jan. 5, 2005)(marginal entry order granting motion to dismiss).

### III. <u>Habeas Proceeding</u>

On July 12, 2002, Eley's sister, Susan Laury ("Laury"), filed a notice of intent to file a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, *Eley v. Bagley*, 02:CV1342 (N.D. Ohio July 12, 2002)(ECF DKT # 1). Concurrent with that notice, Laury filed a motion to appoint counsel, a motion to stay Eley's execution, and a motion for a competency evaluation to determine whether Eley was competent to waive all further appeals.  Laury sought next friend standing to pursue habeas relief on Eley's behalf.  The Court granted the motion to stay Eley's execution.  After the parties briefed the remaining two motions, Eley filed a notice of intent to file a petition for a writ of habeas corpus on October 3, 2002.  *Id.* at (ECF DKT # 13).  Thereafter, the District Court dismissed Laury's matter and Eley's notice of intent was filed under case number 02:CV1994.

In case number 02:CV1994, Laury filed a motion for appointment of counsel on March 19, 2003, (ECF DKT # 12).  Concurrent with that motion, Eley filed a petition for a writ of habeas corpus, (ECF DKT # 9), and a motion for a competency hearing, (ECF DKT # 10).

The Court denied Laury's motion but *sua sponte* appointed Jeffrey Gamso and Jeffrey Helmick to represent Eley, (ECF DKT # 15).  The Court also denied Eley's motion for competency evaluation without prejudice, permitting newly appointed counsel to re-file the

motion if they deemed it to be appropriate.

On November 21, 2003, Eley filed a motion to stay the federal habeas proceedings so that he could file a mental retardation claim in state court pursuant to the holding in *Atkins*, (ECF DKT # 20).  The Court granted the motion, requiring Eley to submit quarterly progress reports regarding the state court litigation, (ECF DKT # 22).[1]

Upon conclusion of his state court proceedings, Eley filed an amended petition on June 2, 2005, (ECF DKT # 34).  The Respondent filed an amended return of writ on August 1, 2005, (ECF DKT # 38), to which Eley filed a traverse, (ECF DKT # 59).  The Respondent filed a sur-reply on November 1, 2005, (ECF DKT # 62).

**IV. <u>Grounds for Relief</u>**

Eley asserts fourteen grounds for relief.  These claims are as follows:

1.    Petitioner Eley's conviction and/or sentence are void or voidable because the three judge panel failed to consider or give effect to relevant mitigation evidence.

2.    The trial court failed to hold a hearing to determine Petitioner Eley's competence.  The requirement that competency be determined where a prima facie question has been established is mandatory.  The failure to hold such a hearing voids the conviction and sentence.

3.    The judgment and sentence against Petitioner Eley are void or voidable because Petitioner's jury trial waiver was in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

4.    Petitioner Eley's convictions and/or sentences are void or voidable due to his neurological impairment which results in his inability to make rational decisions and to assist his attorneys and aid in his defense.

---

[1]    Because he accepted a position with the American Civil Liberties Union, Jeffrey Gamso requested to withdraw from the case, (ECF DKT # 23).  The Court granted the request and appointed David Doughten to replace Gamso, (ECF DKT # 25).

7

5.      The state failed to introduce sufficient evidence upon which to premise a conviction for aggravated murder and, therefore, Petitioner Eley's conviction and sentence of death deprived him of substantive and procedural due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

6.      The statements Eley provided to police officials were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments.  The admission of said statements violated the guarantees contained in *Miranda v. Arizona*, 384 U.S. 436 (1966).

7.      Petitioner Eley's convictions or sentences, or both, are void or voidable due to numerous acts of deficient and ineffective assistance of counsel during the culpability phase of trial.

8.      Petitioner Eley's convictions and sentences are void or voidable because he was denied effective assistance of counsel during the penalty phase as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

9.      Petitioner Eley's convictions or sentences, or both, are void or voidable because the death penalty is disproportionately meted out to those defendants who are racial minorities or those defendants who are accused of killing white victims, or both.

10.     The three judge panel improperly excluded consideration of lesser included offenses to the capital homicide by improperly invoking an "acquittal-first" procedure during the culpability phase of the Petitioner's trial.

11.     Ohio's definition of reasonable doubt is violative of the Constitution as it allows the Petitioner to be convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

12.     The State of Ohio's purported proportionality review is "ethically indefensible."

13.     The effect of cumulative error during the trial deprived Petitioner Eley of a fair trial.

14.     Eley's convictions and sentences are void or voidable because he was convicted and sentenced to death pursuant to [the Ohio death penalty statutes], which are all unconstitutional, both on their face and as applied.

**V. <u>Standard of Review</u>**

8

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Eley's initial petition was filed on June 9, 2003, the AEDPA governs this Court's consideration of his petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (citing *Williams v. Taylor*, 529 U.S. 362, 436 (2000)).  In advancing such goals, Section 2254(d) places new constraints on "the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams*, 529 U.S. at 412.  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

9

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).[2]  The "contrary to" and "unreasonable application" clauses of the Section 2254(d)(1) are independent tests and must be analyzed separately. *Williams,* 529 U.S. at 412-13; *Hill*, 337 F.3d at 711.   A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407; *Hill*, 337 F.3d at 711.   In order for a state court's application of clearly established federal law to be unreasonable, the state court's decision must be more than incorrect or erroneous; rather, it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520-

---

[2]     Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

21 (2003); *Williams*, 529 U.S. at 411; *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000). The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case. *Id.*

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that section of 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003). In that case, the Court noted a "clear factual error" such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id.* at 528-29. In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary. This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Mason v. Mitchell*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary").[3] This presumption only

---

[3] Factual determinations made by a state appellate court after a review of the trial court record constitute a "hearing" where the parties were formally before the court, the petitioner was given an opportunity to be heard, and the petitioner's claim received plenary consideration. *Clark*, 257 F.3d at 546. Consequently, the deference to state court factual determinations required by § 2254 applies to the factual determinations of both trial and appellate courts. *Clark*, 257 F.3d at 546-547.

applies to basic, primary facts, and not to mixed questions of law and fact.

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims adjudicated on the merits in the state court proceeding.  *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  *Id.*; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).[4]  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim.  *Maples*, 340 F.3d at 436-37; *Benge v. Johnson*, 312 F. Supp. 2d 978, 987 (S.D. Ohio 2004).[5]  If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law."  *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)(citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

---

[4]     Prior to *Maples*, the Sixth Circuit had applied the AEDPA standard of review to claims which had not been explicitly mentioned or analyzed by the state courts. *See, e.g., Clifford v. Chandler*, 333 F.3d 724, 730 (6th Cir. 2003); *Doan v. Brigano*, 237 F.3d 722, 727 (6th Cir. 2001).  However, in *Maples*, the Sixth Circuit found that *Doan* and *Clifford* had been abrogated by the United States Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003). *Maples*, 340 F.3d at 437.

[5]     To the extent that the state court did not address a claim due to petitioner's failure to raise it on direct review, the claim may have been procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Maples v. Stegall*, 340 F.3d 433, 437-38 (6th Cir. 2003).

### VI. <u>Exhaustion and Procedural Default</u>

#### A. Exhaustion

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  *Rust*, 17 F.3d at 160.

Claims that were never raised at any juncture of the state-court proceedings are both unexhausted and procedurally defaulted because no Ohio court has had an opportunity to decide them.   If a habeas petitioner sought to return to state court and attempt to present new claims to the Ohio Supreme Court, that court would find them procedurally barred.   "The Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals."  *Fornash v. Marshall*, 686 F.2d 1179, 1185 n.7 (6th Cir. 1982)(citing *State v. Phillips*, 270 Ohio St.2d 294, 300 (1971)).  Thus, Eley's failure to raise a claim to the Ohio Court of Appeals would preclude Ohio Supreme Court review.  This preclusion, in turn, would prevent Eley from satisfying the exhaustion requirement as the

Ohio Supreme Court has not had a "fair and full opportunity" to review these claims as *Rust* requires.[6]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)(quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001))(internal quotation marks omitted).  Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Buell*, 274 F.3d at 349.   To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000)(citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

### B. Procedural Default

### 1. General Law

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state

---

[6]    The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing *Coleman*, 501 U.S. at 732-733). To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001). If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. *O'Sullivan*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001)(citing *Maupin*, 785 F.2d at 138)(further citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, "a later decision rejecting the claim did not silently disregard the bar and consider the merits." *Ylst*, 501 U.S. at 803. "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review." *Id.* at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted. However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or; (2) a fundamental miscarriage of justice would result from a bar on federal review. *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275.

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp.2d 796, 801 (E.D. Mich. 2002). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp.2d at 801. Second, constitutionally ineffective assistance of counsel

constitutes cause.  *Murray*, 477 U.S. at 488-489; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Mohn*, 208 F. Supp.2d at 801, 804.

    If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  *Murray v. Carrier*, 477 U.S. 478, 488-489 (1986).  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim.  *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

    To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995)(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."  *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

    Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  *Dretke v. Haley*, 541 U.S. 386, 392 (2004)(citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1985)).  When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner

17

could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

The Respondent asserts that some of the claims raised in the Petition are barred from review by this Court because they are procedurally defaulted.[8]  Eley attacks the Respondent's assertions of procedural default because they are based on the rule enunciated by the Ohio Supreme Court in *State v. Perry*, 10 Ohio St.2d 175 (1967).  The Court will address each individual claim of procedural default when it reviews Eley's distinct claims for relief.  At this juncture, however, the Court will address Eley's general counter-arguments to the Respondent's allegations of procedural default.

## 2. The *Perry* Rule

### a. not consistently applied

Eley argues this Court may address on the merits any claim the Respondent asserts is barred by the *Perry* doctrine[9] because it is not "adequate."  A procedural rule is not "adequate," unless, among other things, it is regularly and consistently applied.  *See Warner v. United States*, 975 F.2d 1207, 1213 (6th Cir. 1992), *cert. denied*, 507 U.S. 932 (1993)(stating that the rule only applies to "firmly established and regularly followed state practices.")(citing *Ford v. Georgia*, 498 U.S. 411, 422 (1991)).  Thus, concludes Eley,

---

[8]     Respondent alleges that Eley has procedurally defaulted part of claim 1, claim 3, part of claim 7, claim 8, and claim 13.

[9]     *State v. Perry*, 10 Ohio St.3d 175 (1967)(holding any claim that was raised or could have been raised on direct appeal is barred from review on post conviction under the doctrine of *res judicata*).

because of the Ohio courts' inconsistent application of *Perry*, this Court need not defer to an Ohio court's finding of a *Perry* violation.

To support his argument, Eley cites to several capital cases in which the Ohio Supreme Court, on direct appeal, *sua sponte* addressed the merits of claims the Court of Appeals had concluded were barred by *res judicata*, or considered claims that had not even been raised in the Court of Appeals and, thus, *should have been* barred by *res judicata*.

Some of the cases relied upon by Eley clearly do no support his argument and are, in fact, inapposite.  For instance, in each of the following three cases, a well-established exception to the *res judicata* doctrine applied, or the court did not actually engage in a merits review.  Eley first relies on *State v. Buell*, 22 Ohio St.3d 124, 142 (1986).  In *Buell*, the court analyzed the constitutionality of the imposition of the death penalty in light of the recently decided United States Supreme Court decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1987), even though the appellant did not raise the issue at trial, or in his appeal to the Ohio Supreme Court.  The reason the Ohio Supreme Court considered the claim *sua sponte* was that it *could not have been raised before*.  *Caldwell* was decided in 1985, after Buell's appeal had been filed and resolved by the Ohio Court of Appeals.

Similarly, in *State v. Huertas*, 51 Ohio St.3d 22 (1990), the Ohio Supreme Court resolved an issue and ultimately granted relief on the basis of a Supreme Court opinion, *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled by Payne v. Tennessee*, 501 U.S. 808 (1991), which was issued after the appellant's trial and after the appeal had been filed, but before the appellate court issued its decision.  *Id.  Booth* held the use of victim impact evidence during the penalty phase of a capital trial is unconstitutional.  There is no indication in the opinion

19

itself that the petitioner had failed to raise a claim based on the use of victim impact statements.  Thus, it is possible the *claim* had been raised below, even if the appellant could not have relief based on *Booth*.  Thus, *Huertas* is unhelpful to Eley.

Eley's reliance on *State v. Rogers*, 32 Ohio St.3d 70 (1987), suffers from the same defect.  The court considered a claim based on the prosecutor's evidentiary use of the petitioner's post-*Miranda* exercise of his right to silence, in violation of the recently decided *Wainwright v. Greenfield*, 474 U.S. 284 (1986).  As in *Huertas* and *Buell*, the United States Supreme Court decision was issued after the appellant's direct appeal to the Court of Appeals, and, thus, the appeal to the Ohio Supreme Court presented the earliest opportunity for raising the claim.

In other cases, however, the Ohio Supreme Court did appear to ignore the *res judicata* bar and address the appellant's claims on the merits without explaining why it was doing so. *See State v. Williams*, 38 Ohio St.3d 346 (1988)("Because of the gravity of the sentence that has been imposed on appellant, we have reviewed the record with care for any errors that may not have been brought to our attention.  In addition, we have considered any pertinent legal arguments which were not briefed or argued by the parties."); *State v. Hamblin*, 37 Ohio St.3d 153 (1988)("Because this is a capital case, we will review all five arguments [even those not raised below] relating to the claim of ineffective assistance of counsel."); *State v. Esparza*, 39 Ohio St.3d 8 (1988)(considering issue of jury venire, even though it was "challenge[d] for the first time on appeal"); *State v. Barnes*, 25 Ohio St.3d 203 (1986)(stating, "since the instant argument was neither raised before, nor ruled on by, the court of appeals, this court is not

20

required to address it on the merits," but addressing the claim anyway).[10]

That the Ohio Supreme Court occasionally chooses to address the merits of the claims that are otherwise barred from review on the basis of *res judicata* does not mean that Ohio's law of *res judicata* is so inconsistent as to be inadequate, however.  Rather, these are the exceptions that prove the rule.  As the Fourth Circuit has held, "[c]onsistent or regular application of a state rule of procedural default does not require that the state court show an 'undeviating adherence to such rule admitting of no exception.'" *Yeatts v. Angelone*, 166 F.3d 255, 263-64 (4th Cir. 1999), *cert. denied*, 526 U.S. 1095 (1999)(quoting *Wise v. Williams*, 982 F.2d 142, 143 (4th Cir. 1992)).  Rather, the procedural rule is adequate, if, as "a general rule, [it has] been applied in the vast majority of cases."  *Plath v. Moore*, 130 F.3d 595, 602 (4th Cir. 1997)(internal quotation marks omitted), *cert. denied*, 523 U.S. 1143 (1998).  While the Ohio courts of appeals may not be paradigms of consistency, they do not ignore or arbitrarily decline to apply Ohio's procedural bars, including the *Perry* rule, on a regular basis.  Indeed, the procedural bar is applied in the vast majority of cases, both capital and non-capital.  Moreover, there has been no showing that because of the above-mentioned exceptions, Eley or other capital habeas petitioners *reasonably* came to believe the *Perry* rule had been abandoned in capital cases.   Thus, there was no basis to conclude the exception had become the rule, or that it would have been reasonable for a petitioner to assume it had.[11]

---

[10]     In virtually every case in which the Ohio Supreme Court has forgiven a procedural default, and addressed a claim on its merits, the Court has concluded the claim was without merit.

[11]     The Ohio Supreme Court has expressly rejected the argument that procedural bars are or should be less strictly enforced in capital cases:

Ultimately, Eley's argument is unpersuasive.  The Sixth Circuit has specifically held that Ohio's application of the *res judicata* doctrine under *Perry* is an adequate and independent state ground.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)("This court has held that [the *Perry* rule] is regularly and consistently applied by Ohio courts as required by the four-part *Maupin* test.")(citing *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000)).  *See also Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999), *cert. denied*, 528 U.S. 946 (1999)(noting that the *Perry* rule has been consistently applied); *Brooks v. Edwards*, 96 F.3d 1448 (Table), 1996 WL 506505, at *5 (6th Cir. Sept. 5, 1996)("The procedural rule [of *res judicata*] applicable to petitioner's claims is an adequate and independent state ground for refusal to hear the claim by the Ohio Supreme Court.").  Consequently, this Court holds any claim the Ohio courts refused to address based on *Perry* is procedurally defaulted and barred from habeas review absent a showing of cause and prejudice.

### b. post-conviction system violates due process

Eley also asserts a broad challenge to the constitutionality of Ohio's post-conviction system, contending Ohio's post-conviction bar of *res judicata* does not satisfy due process requirements.  According to Eley, Ohio's post-conviction system is designed to create

---

The mere fact that punishments differ provides no basis to assert that procedural rules should differ in their application to the crime charged.  We hold that capital defendants are not entitled to special treatment regarding evidentiary or procedural rules. . . .  We will utilize the doctrine of waiver where applicable; yet we must also retain the power to *sua sponte* consider particular errors under exceptional circumstances.

*State v. Greer*, 390 Ohio St.3d 236, 244 (1988).

22

procedural defaults for the sake of judicial convenience, and provides no meaningful opportunity for petitioners to identify, investigate, or prove constitutional violations.  The thrust of his argument seems to be that Ohio's post-conviction practice makes compliance with its procedural requirements so difficult that petitioners are set up for failure.  This argument is unpersuasive.

In support of his argument, Eley relies on *Easter v. Endell*, 37 F.3d 1343, 1345 (8th Cir. 1994); *Harmon v. Ryan*, 959 F.2d 1457, 1462 (9th Cir. 1992); and *Kim v. Villalobos*, 799 F.2d 1317, 1321 (9th Cir. 1986).  None of these cases supports Eley's argument that *Ohio's* application of *res judicata* in post-conviction proceedings violates due process.

In *Easter*, the petitioner pled guilty to various crimes in an Arkansas state court in December of 1989.  At the time, Arkansas did not allow those who pleaded guilty to appeal; in addition, Arkansas had no real post-conviction system in place.  A year after Easter's guilty plea and conviction, Arkansas erected a post-conviction procedure (Rule 37) that allowed for the review of guilty pleas.  However, petitions containing such challenges were required to be filed within ninety days of judgment.  The Arkansas Supreme Court subsequently held individuals who had pleaded guilty during the period in which Rule 37 was *not* in effect had a right to challenge their guilty pleas under the rule.  *State v. Fox*, 309 Ark. 619 (1992).  The Arkansas Supreme Court also said, however, such challenges still had to be made within the ninety day period.  Easter filed a Rule 37 petition, and it was denied as untimely.  Easter raised a challenge to his guilty plea on federal habeas review, and the district court held the claim was procedurally defaulted.

The Eighth Circuit Court of Appeals reversed.  The Court held the *Fox* procedural bar

23

was not adequate *as to Easter*,[12] because it was not a firmly established rule when applied to him.[13]  In this case, Eley has not shown any of his procedural defaults were due to a procedural rule that was not firmly established at the time it was applied to him.[14]

*Harmon* also offers no support for Eley's claim.  In *Harmon*, the district court dismissed the petitioner's habeas corpus petition because he had failed to pursue a direct appeal in the Arizona Supreme Court first.  The Ninth Circuit reversed, holding the Arizona Supreme Court had misled the petitioner about what he needed to do to exhaust his state remedies.  The Ninth Circuit held the petitioner's default was due to the fact that, prior to its occurrence, the Arizona Supreme Court expressly held "'[o]nce the defendant has been given the appeal to which he has a right [*i.e.*, in the state intermediate appellate court], state remedies have been exhausted.'"  *Harmon*, 959 F.2d at 1463 (quoting *State v. Shattuck*, 140 Ariz. 582, 585 (1984)).  Thus, the Ninth Circuit concluded, in light of *Shattuck*, it was reasonable for an Arizona defendant to believe an appeal to the Arizona Appeals Court was all that was needed to exhaust his state remedies before pursuing a federal habeas action, and the failure to appeal to the Arizona Supreme Court was excused.  Here, Eley has not pointed

---

[12]    The Court was careful to point out that "Arkansas' post-conviction procedures as embodied by *Fox* are not *in themselves* constitutionally infirm."  *Easter*, 37 F.3d at 1346.

[13]    This was an application of the Supreme Court's decision in *Ford v. Georgia*, 498 U.S. 411 (1991)(holding that a state procedural rule that was not clearly defined before the default is not an adequate state ground for purposes of determining procedural default).

[14]    *Pearson v. Norris*, 52 F.3d 740 (8th Cir. 1995), also involved Arkansas Rule 37.  In *Pearson*, the Court held because any attempt by the petitioner to file an untimely Rule 37 petition would be rejected by the Arkansas courts, the claim should be addressed by the federal district court on the merits.

24

to a single decision which misled him about his obligations.

Likewise, *Kim* does not assist in Eley's argument.  In *Kim v. Villalobos*, 799 F.2d 1317, 1321 (9th Cir. 1986), the Ninth Circuit held where a *pro se* prisoner's failure to plead his claims with particularity resulted in his being unable to pursue post-conviction relief, the procedural default would be excused.  Here, there is no such obstacle to Eley, who was represented by counsel throughout his appeal and post-conviction proceedings.  Accordingly, this argument fails.

Finally, Eley asserts this Court should excuse any procedural default for claims barred by the *Perry* doctrine if they are based on evidence *de hors* the record.  The Court declines to express a general conclusion regarding this issue and will address this argument as it is raised in regard to Eley's individual grounds for relief.

### VII. <u>Analysis of Petitioner's Claims</u>

**1.     Petitioner Eley's conviction and/or sentence are void or voidable because the three judge panel failed to consider or give effect to relevant mitigation evidence.**

Eley contends the three judge panel that sentenced him failed to consider all the evidence he presented during the mitigation hearing.  Specifically, he maintains the panel did not give effect to the evidence he presented regarding: (1) his dysfunctional family, including his abusive step-father and neglectful father; (2) his financial and personal assistance to others in his family, including a child with a learning disability; (3) his history of chronic alcohol and substance abuse, which at times caused him to blackout; (4) his low intelligence level; (5) his remorse for the murder of the victim; (6) residual doubt as to Eley's specific intent to kill

the victim; and, (7) his killing while under duress by co-defendant, Melvin Green.[15]

Trial courts are required to issue a sentencing opinion in death penalty cases under Ohio Revised Code § 2929.03(F). Eley maintains the trial court failed to consider and give effect to the mitigating evidence in its sentencing opinion. The Respondent, conversely, asserts the trial court did consider the evidence presented during mitigation, but chose to assign it little weight. A review of the trial court's opinion reveals it neither discussed the evidence Eley presented during mitigation in its sentencing opinion nor articulated why the aggravating factor outweighed the mitigating circumstances.[16]

The Respondent also asserts it is immaterial whether or not the trial court considered the mitigating evidence in its sentencing decision because both the Seventh District Court of Appeals and the Ohio Supreme Court independently re-weighed Eley's sentence.

Although no United States Supreme Court case is directly on point, *Clemmons v. Mississippi*, 494 U.S. 738 (1990), offers some guidance. In that case, the United States Supreme Court found a death sentence could be upheld on appeal even when the jury had considered an invalid or improperly defined aggravating factor. The court determined:

> Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would

---

[15] The Respondent concedes all but sub-claim (7) is properly preserved for review. Eley's seventh sub-claim was never raised at any juncture of Eley's state court appeals. Thus, as is stated above, it is both unexhausted and procedurally defaulted. The Court will not consider the merits of that sub-claim.

[16] Eley also asserts the trial court's opinion constituted "boilerplate" that did not address his case individually. Because Eley merely surmises the trial court did not review his mitigating evidence based on the language the trial court used in its sentencing opinion, the Court finds Eley cannot substantiate this supposition.

> be infringed where an appellate court invalidates one or two or more aggravating  circumstances found by the jury, but affirms the death sentence after itself finding that one or more valid remaining aggravating factors outweigh the mitigating evidence.  Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court.

*Id.* at 745 (citations omitted).

The Court revisited the re-weighing issue in *Stringer v. Black*, 503 U.S. 222 (1992). In *Stringer*, the Court further clarified the state appellate re-weighing process necessary to uphold a death sentence resulting from a constitutionally impermissible aggravating circumstance.  First, the Court divided states into "weighing" states or "finding" states.  The Court determined appellate review in a "weighing" state would require closer scrutiny than a "finding" state.[17]  In weighing states, the Court opined, ". . . for a state appellate court to affirm a death sentence after the sentencer was instructed to consider an invalid factor, the court must determine what the sentencer would have done absent the factor."  *Id.* at 230.[18]

---

[17]    Ohio is a "weighing" state.  *See* Ohio Rev. Code  § 2929.04(B)

[18]    Since the parties have filed their briefs arguing the applicability of *Stringer*, the United States Supreme Court has revamped the *Stringer* test.  *Brown v. Sanders*, – U.S. – , 126 S.Ct. 884 (2006).  In *Brown*, the Supreme Court dispensed with the "weighing" vs. "finding" classification and held a death sentence would be invalid if "[a]n invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."  *Id.* at 892 (footnote omitted).

Although the parties based their arguments on the now-defunct *Stringer* holding, the abrogation of the *Stringer* test does little to alter the independent re-weighing arguments the parties asserted.

Eley asserts both *Clemmons* and *Stringer* are inapposite because they involve circumstances in which the fact finder considered a constitutionally infirm aggravating circumstance.  In his case, Eley claims, the trial court failed to consider relevant mitigating evidence.  Thus, he asserts, this Court cannot find the state courts' re-weighing of his sentence cured any trial court defect under the holdings in *Clemmons* and *Stringer*.

The Court disagrees.  In *Baston v. Mitchell*, 420 F.3d 632 (6th Cir. 2005), the Sixth Circuit squarely addressed the issue of whether the Ohio Supreme Court's re-weighing of a death sentence because of the fact finder's failure to consider additional mitigating evidence falls under the purview of *Clemmons*.  The *Baston* court reasoned: "[w]eighing aggravating and mitigating factors against each other requires considering both sets of factors.  Thus, there is no reason that an appellate court could properly re-weigh after removing an aggravating factor from consideration, but could not do so after adding an additional mitigating factor."  *Id.* at 638.

The *Baston* holding is fatal to Eley's assertion that independent re-weighing cannot cure any trial court sentencing errors.  Although Eley attempts to assert another Sixth Circuit case, *Abdus-Samad v. Bell*, 420 F.3d 614 (6th Cir. 2005), calls the *Baston* holding into question, Eley's assertion cannot prevail.  In that case, the Sixth Circuit held the Tennessee Supreme Court could find no harmless error when an aggravating factor the jury considered was later found to be constitutionally infirm in part because there was no "new information to the jury" regarding that aggravating factor.  *Id.* at 623.  Eley extrapolates from this single phrase the Sixth Circuit held a re-weighing in which an appellate court must utilize new evidence is impermissible.  This presumption is not supported by any other language in

28

*Abdus-Samad* and completely contrary to the holding in *Baston*, which addressed the identical issue Eley presents here.  Thus, the Court finds the *Baston* holding, which held appellate court re-weighing for consideration of mitigating factors is constitutional, controls.

As stated above, both the Seventh District Court of Appeals and the Ohio Supreme Court performed an independent review of Eley's death sentence.  The Court of Appeals considered all of the evidence Eley presented during the mitigation hearing and meticulously articulated its effect on the sentence:

> Here, appellant argues that the death sentence was inappropriately and unconstitutionally imposed in this case due to the mitigating evidence presented by him. Appellant argues that he presented evidence of a dysfunctional family background; evidence that, despite this background, he established positive relationships with his mother, siblings, nieces and nephews; evidence of limited intellectual ability and education; evidence of chronic alcoholism and polysubstance abuse which lead to problems with the law and, further, caused appellant to exercise poor judgment and impulsively act out; evidence of previous head injuries; evidence of good behavior while incarcerated and subsequent religious conversion; evidence of residual doubt; evidence that the co-defendant, Melvin Green, went unpunished; and prosecutorial misconduct and the introduction of gruesome photographs. Appellant argues that these factors all constitute mitigating evidence which outweighs the aggravating circumstance of aggravated murder committed during the course of an aggravated robbery.
>
> A review of the record does not support a finding that all of the foregoing were established as mitigating factors in the instant case. With regard to appellant's family background, it is true that appellant was not raised under ideal circumstances. It is the sad truth that a growing multitude of children are raised in one-parent households or in households where one or both parents are abusers of drugs or alcohol. Yet, most of these individuals, while certainly not escaping without scars of some sort, manage to enter into society as law-abiding citizens. Appellant's siblings are an example of this.
>
> While appellant lacked the love and stability of a second parent, the record shows that appellant's mother was a responsible, caring parent who completed schooling for nursing and who had worked as a nurse for almost eighteen years at the time of trial. Appellant's sisters completed schooling and are working, responsible members of the community. The Ohio Supreme Court has

29

suggested that where there is evidence that other siblings have grown up as law-abiding citizens, the mitigating nature of a disruptive or chaotic childhood is reduced. *See, generally, State v. Esparza, supra*, at 16; *State v. Steffen, supra*, at 129.

Thus, while appellant asserts that the evidence established the existence of a dysfunctional family background, the record in this case shows that, while appellant certainly could have had a more stable childhood with the addition of a second loving, nurturing parent, the circumstances under which he was raised, even if of some mitigating value, do not outweigh the aggravating circumstances in this case. *See, generally, State v. Steffen, supra*, at 128- 129; *State v. Cooey, supra*, at 41.

Appellant also asserts that the fact that he established positive relationships with his mother, siblings and other family members is a mitigating factor, citing *Parker v. Dugger* (1991), 498 U.S. 308. However, we see this evidence as tending to show that appellant knew the difference between right and wrong and was able to appreciate the criminality of his acts. This reading is consistent with the testimony of Dr. Darnell, who testified that appellant did not technically meet the qualifications for anti-social personality disorder and that appellant was able to appreciate the criminality of his actions.

Appellant further asserts that he established as mitigating factors a limited intellectual ability and a limited education. However, Dr. Darnell testified that appellant was literate and was able to comprehend what he would need to know to function on a day-to-day basis. Thus, this factor is entitled to little, if any, mitigating value.

Appellant also asserts that his alcohol and substance abuse problems were mitigating factors and that the head injury sustained by him was also a mitigating factor. However, the record does not support this assertion. Family members characterized appellant as a non-violent person, even when he drank. Further, Dr. Darnell concluded that while appellant did have alcohol and polysubstance abuse problems which had invested appellant with certain antisocial personality traits, it did not appear to him that appellant was in an alcohol- or drug-related blackout at the time of the offense. Dr. Darnell further concluded that appellant was sane and competent at the time of the offense. Further, there is no evidence in the record to support a finding that the head injury sustained by appellant when he was young had any effect on his actions.

Based on the foregoing, we cannot say that the panel erred in concluding that appellant's alcohol and drug abuse was not a mitigating factor which

outweighed the aggravating circumstances in this case. *See, generally, State v. Cooey, supra*, at 41; *State v. Maurer, supra*, at 245.

Appellant asserts that his good behavior in jail and his subsequent religious conversion were established as mitigating factors. However, under the facts of this case, we view these with little, if any, importance. Dr. Darnell testified that the remorse exhibited by appellant was more for himself and his family rather than for the victim. With that testimony, any mitigating value that good jail behavior and religious conversion would have had is diminished.

Appellant further argues that the mitigating factor of residual doubt should have been considered by the panel. Appellant argues that there was no physical evidence linking appellant to the murder of the victim, that there were no eyewitnesses, and that there were no witnesses which placed appellant at the scene on the date in question.

Based upon the record herein, we cannot say that the panel erred in failing to find residual doubt as a mitigating factor. The details set forth in appellant's statement, which we have found to have been properly admitted into evidence, corresponded with the physical evidence found at the scene, i.e. the position of the body of the victim after the shooting, the state of the cash register, the brown bag, the path followed by Melvin Green and his accomplice both to and from the store, etc. The statement further corresponds with the testimony of Cheryl Cooper, who testified that she saw Melvin Green and another man carrying a brown bag, and with Christopher Cretella, who testified that he saw Melvin Green and another man with a brown bag run through the woods. Given the foregoing, we cannot say residual doubt was a mitigating factor established in this case.

Appellant also argues that imposition of the death penalty was inappropriate since Melvin Green went unpunished after being tried separately and acquitted. In *State v. Burke* (1995), 73 Ohio St.3d 399, 407, the Ohio Supreme Court, citing *State v. Green* (1993), 66 Ohio St.3d 141, 151, *U.S. certiorari denied* 126 L.Ed.2d 203, held that:

> "*** the disparity of sentence between accomplices does not justify reversal of a death sentence, where the sentence is neither illegal nor an abuse of discretion."

As in *Burke*, appellant has made no showing here that his death sentence is illegal or an abuse of discretion. Thus, this argument is without merit.

*State v. Eley*, No. 87 CA 122, 1995 WL 758808, at *24-26 (Ohio Ct. App. Dec. 20, 1995).

The Ohio Supreme Court also re-weighed the aggravating factor with the evidence

31

Eley presented during mitigation, but found that the death sentence was warranted.  It held:

> After independent assessment, we find that the evidence supports beyond a reasonable doubt that Eley murdered Ihsan "Easy" Aydah while committing or attempting to commit aggravated robbery, and that Eley was the principal offender in the aggravated murder. R.C. 2929.04(A)(7).

> We find nothing in the nature and circumstances to be mitigating. Eley participated in a robbery where, under the circumstances, a murder was likely to occur. Eley used a gun, and was aware that the proprietor kept a gun under the store counter. After shooting Aydah and fleeing the scene of the crime, Eley divided the stolen money with his accomplice, and then hid out until his arrest.

> Eley's history, character, and background are entitled to modest weight in mitigation. Eley was seven or eight years of age when his parents divorced, and he had a weak relationship with his father. At one time, Eley had a good relationship with his stepfather, but the stepfather would get "nasty" when he drank alcohol. On one occasion, he physically abused Eley's mother and sister. Eley defended them by stabbing his stepfather.

> Eley's mother and sister testified that Eley had expressed frustration over being placed in slow learner classes, but they encouraged him that he had a good mind. Nevertheless, Eley quit school in the ninth grade, then entered the Job Corps at age seventeen and learned how to be a welder. While in the Job Corps, Eley would send money home to his family and, in one instance, gave his mother $100 to finish payments for her nursing education.

> Eley's mother and sister both conceded that Eley had problems with alcohol and drugs, but maintained that "you wouldn't want to meet a better person" when he wasn't abusing these substances. Eley's sister described him as normally a "quiet, sweet, gentle person that wouldn't hurt anybody." Eley's brother-in-law stated that Eley was kind and concerned with his children, especially with the one who has a learning disability. Eley's mother stated that all his siblings love him, and that Eley was "church oriented" growing up, and is now "born again." Eley's unsworn statement, consisting mostly of Bible verses, seems to support this assertion. However, Eley had served time in prison for shooting a man in the legs, and for breaking and entering.

> Dr. Douglas Darnell testified that Eley was of borderline intelligence, but could comprehend most material he would encounter day-to-day and is literate. Darnell stated that Eley has a chronic history of both alcohol and polysubstance abuse, but found "no evidence of psychosis or major defective disorder." Eley understands the difference between right and wrong, but has a

history of impulsivity. Darnell found Eley to be remorseful, but not about the victim of his crime. However, two of the police detectives present when Eley confessed testified that Eley appeared to be remorseful and sorrowful for murdering Aydah.

We find none of the first six statutory mitigating factors in R.C. 2929.04(B) to be relevant. However, several aspects of factor (7), the catchall factor, deserve some weight in mitigation. Eley's longstanding, consistent devotion and care for his family deserve some weight. *See State v. Lawrence* (1989), 44 Ohio St.3d 24, 33. While the testimony was conflicting, Eley had shown remorse, which is worthy of some weight in mitigation. *See State v. Landrum* (1990), 53 Ohio St.3d 107.

Based upon the foregoing, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Eley confessed to the crimes of aggravated murder and aggravated robbery against Ihsan Aydah, and his actions merit the capital penalty to which he was sentenced.

*State v. Eley*, 77 Ohio St.3d 174, 188-90 (1996)(parallel citations omitted).

Upon reviewing the re-weighing of Eley's sentence by both the Seventh District Court of Appeals and the Ohio Supreme Court, the Court finds they comport with the requirements of *Clemmons* and *Stringer*. Both opinions set forth in great detail the evidence Eley adduced during the mitigation phase and the weight each court assigned it. Moreover, each court set forth the reasons why it chose to assign Eley's evidence little weight and why the aggravating factor outweighed the evidence in mitigation. Thus, the re-weighing opinions are in compliance with constitutional requirements as set forth in *Clemmons* and *Stringer*. The Court holds any defect in the trial court's sentencing opinion was cured by the Court of Appeals' and Ohio Supreme Court's re-weighing of the sentence. Eley's first claim for relief is not well-taken.

2.      **The trial court failed to hold a hearing to determine Petitioner Eley's competence. The requirement that competency be determined where a prima facie question has been established is mandatory. The failure to hold such a hearing voids the conviction and sentence.**

33

Eley alleges that he is entitled to habeas relief because the trial court failed to hold a competency hearing prior to trial.  He maintains he made an initial showing of his incompetence and the trial court was therefore required to hold a hearing to determine whether he was fit to stand trial.  Before the trial began, Eley had entered a plea of not guilty by reason of insanity.  Defense counsel moved the trial court to appoint a psychiatric expert for the defense and for the trial court to hold a competency hearing.  The trial court granted both motions, appointing Dr. Douglas Darnell to examine Eley.  The court also scheduled a competency hearing for February 10, 1987.  Eley, however, refused to speak with Dr. Darnell.  On May 11, 1987, Eley withdrew his not guilty by reason of insanity plea and entered a plea of not guilty.  Thus, the trial court never held a hearing regarding Eley's competency.

The United States Supreme Court has long recognized that the criminal trial of an incompetent defendant violates due process.  *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975); *see also Pate v. Robinson*, 383 U.S. 375, 385-86 (1966)(holding due process violation applicable to state trials through Fourteenth Amendment).  To determine if a criminal defendant is competent to stand trial, a trial court must determine "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960).

In *Pate v. Smith*, 637 F.2d 1068 (6th Cir. 1981), the Sixth Circuit, following the holdings of *Pate v. Robinson* and *Drope v. Mississippi*, held a trial court must conduct a hearing, even if defense counsel do not request one, when the defendant displays indicia of incompetence either during trial or has a history of mental instability.  In that case, the

34

petitioner alleged, as Eley does here, the trial court was required to hold a competency hearing on its own motion in the absence of defense counsel's request for it.  Although Pate had been found competent to stand trial by a forensic psychiatrist, the psychiatrist's report also noted  Pate was admitted to a state mental hospital eight times in the past, there were indications  Pate suffered from brain damage, and because of a possible brain tumor, Pate's failure to take his medication, his consumption of alcohol, or severe emotional distress could render him insane.  *Id.* at 1071.  Additionally, Pate caused a disturbance in the courtroom during trial that led to the trial court's removal of Pate until the following day.  The trial judge became concerned about Pate's competence but resolved this doubt by privately consulting the forensic psychiatrist's report.

The Sixth Circuit held the trial court's resolution of this issue violated petitioner Pate's right to due process.  Rather than privately allaying his concerns, the *Pate* court held, the trial court should have held a hearing because it would have produced a record and permitted the defendant an opportunity to present and cross-examine witnesses.  *Id.* at 1072.  Thus, the Sixth Circuit held Pate was entitled to habeas relief.

On direct appeal, the Ohio Supreme Court identified the above-cited Supreme Court precedent on the competency issue when denying Eley's proposition of law:

> In Proposition of Law X, Eley next argues that the trial court should have conducted a competency hearing, since there was a bona fide doubt as to his competency. *See Pate v. Robinson* (1966), 383 U.S. 375. Eley submits that the court's failure to conduct such a hearing precluded the development of evidence which would have revealed sufficient indicia of incompetence.
>
> The record indicates that on December 29, 1986, Eley's counsel requested the appointment of a psychiatric expert and a competency hearing. The court ordered an examination and on February 4, 1987, set a competency hearing for February 10, 1987. On February 10, Dr. Douglas Darnell was appointed by the

35

court to reexamine Eley. The competency hearing, however, was never held. Then, on May 11, 1987, Eley withdrew his plea of not guilty by reason of insanity and chose to proceed solely on a plea of not guilty. At that time, Eley filed a document acknowledging that he "knowingly and intelligently" withdrew "any challenge to his competency to proceed with the trial of this action." Thus, Eley affirmatively waived his right to a competency hearing that he previously requested pursuant to R.C. 2945.37.

Even if we were to find Eley's waiver invalid, any error by the trial court in not conducting a hearing was harmless, since the record fails to reveal sufficient indicia of incompetency. *See State v. Bock* (1986), 28 Ohio St.3d 108, paragraph one of the syllabus. Other than mentioning a few aspects of his background that were brought out during the mitigation phase, Eley fails to cite any portion of the record which reveals any suggestion of incompetency. Accordingly, we reject Proposition of Law X.

*State v. Eley*, 77 Ohio St.3d at 183-4 (parallel citations omitted).

While the Ohio Supreme Court could have provided a more thorough analysis of this claim, this Court cannot find that the Ohio Supreme Court's application of *Pate* was an unreasonable one.  Unlike the trial court in *Pate v. Smith*, the three-judge panel in Eley's trial did not have nearly the quantum of evidence in which to entertain a suspicion that Eley was incompetent.  Eley asserts the trial court should have been aware he was incompetent because he refused to cooperate at Dr. Darnell's psychiatric evaluation and because he refused to accept a plea bargain from the State in which he would be spared the death penalty in exchange for his testimony against co-defendant Green.

These facts hardly suggest the kind of mental health issues present in *Pate v. Smith*. Unlike Pate, Eley was not institutionalized for mental health problems and there were no indications of brain damage or other significantly sub-average intellectual functioning. Moreover, the trial court apparently did not observe any indications during trial that would cause Eley's competence to become suspect.  Finally, as the *Drope* Court recognized, "judges

36

must depend to some extent on counsel to bring issues into focus." *Drope*, 420 U.S. at 176-77. Here, counsel withdrew the motion for a competency hearing after Eley would not submit to a psychiatric evaluation. Thus, the Ohio Supreme Court was not unreasonable in determining that there were insufficient indicia of Eley's incompetence to require it to hold a competency hearing. Eley's second ground for relief is not well-taken.[19]

**3.** **The judgment and sentence against Petitioner Eley are void or voidable because Petitioner's jury trial waiver was in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

---

[19] Moreover, it is unclear whether this Court must utilize the more stringent standard of 28 U.S.C. § 2254(e)(1) when reviewing this claim. That statute states that a federal habeas court must presume a state court's factual findings are correct. A habeas petitioner may rebut this presumption only upon demonstrating it is incorrect "by clear and convincing evidence." *Id.*

"The presumption of correctness accorded to state court findings only applies to basic, primary facts, and not to mixed questions of law and fact." *Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000)(internal quotation marks and further citations omitted). In *Mackey v. Dutton*, 217 F.3d 399, 413 (6th Cir. 2000), the Sixth Circuit held contrary to its prior findings, "§ 2254(d)'s presumption of correctness applies to a trial court's competency determination." *Id.* Although the *Mackey* court noted it previously had held in *Cremeans v. Chapleau*, 62 F.3d 167 (6th Cir. 1995), competency determinations are mixed questions of law and fact, the subsequent United States Supreme Court holding in *Thompson v. Keohane*, 516 U.S. 99, 111 (1995), superceded the *Cremeans* holding. *Id.* District courts have followed this holding, concluding, "[a] determination by a state trial court that a habeas petitioner was competent to stand trial is a finding of fact that is entitled to the presumption of correctness for purposes of federal habeas review." *Hastings v. Yukins*, 194 F.Supp.2d 659, 670 (E.D. Mich. 2002)(citing *Maggio v. Fulford*, 462 U.S. 111, 117 (1983); *Mackey*, 217 F.3d at 412).

In this case, the trial court made no explicit finding regarding Eley's competency. Thus, it would appear that the *Mackey* holding does not apply. If the trial court's failure to conduct a competency hearing in the wake of Eley's initial request for one is a tacit finding of Eley's competence, however, then the *Mackey* holding arguably could apply to this Court's review of this claim. The Court finds that Eley has not rebutted the trial court's finding of his competence in this event.

The Court will not review this claim because Eley withdrew it in his Traverse.  *See* Traverse at 3.

**4.     Petitioner Eley's convictions and/or sentences are void or voidable due to his neurological impairment which results in his inability to make rational decisions and to assist his attorneys and aid in his defense.**

The Court will not review this claim because Eley withdrew it in his Traverse.  *See* Traverse at 3.

**5.     The state failed to introduce sufficient evidence upon which to premise a conviction for aggravated murder and, therefore, Petitioner Eley's conviction and sentence of death deprived him of substantive and procedural due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.**

In this ground for relief, Eley argues the evidence the State adduced during his trial was insufficient to prove an intent to kill.  He contends at the time of his trial, the State was required to prove Eley had the specific intent to kill, even on a felony-murder charge.  He asserts the fact that he told police he merely intended to shoot Aydah in the shoulder and the fact that he only fired a single shot is evidence that he did not intend to kill Aydah.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the United States Supreme Court explained the standard of review a habeas court must employ when reviewing an insufficiency of the evidence claim.  It concluded the habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319; *Biros v. Bagley*, 422 F.3d 379, 392 (6th Cir. 2005).  In applying *Jackson*, this Court must limit itself to evidence adduced during trial because a "sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.'  *Jackson* does not extend to non-record

evidence, including newly discovered evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993)(citing *Jackson*, 443 U.S. at 318).  The *Jackson* standard does apply, however, "whether the evidence of guilt was direct or circumstantial." *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002)(citing *Spalla v. Foltz*, 788 F.2d 400, 402 (6th Cir. 1986)).

Eley raised this claim on direct appeal to the Ohio Supreme Court, which rejected it on the merits.  It held that the prosecution had demonstrated sufficient evidence of Eley's intent to kill to support the panel's conviction:

> In Proposition of Law II, Eley argues that the evidence proffered by the state was insufficient to prove every essential element of the capital crime with which he was charged. Eley further contends that his conviction was against the manifest weight of the evidence.
>
> When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307; *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Id. at 273.
>
> * * *
>
> Eley also asserts that he did not possess the culpable mental state required for conviction under R.C. 2903.01(B) and (D), and that specific intent is lacking, since his statement to police indicated that he tried to shoot Aydah in the shoulder. Therefore, Eley submits that his specific intent was only to wound the victim, who was reaching for a gun.
>
> However, intentional use of an inherently dangerous weapon during the commission of a felony, resulting in death, is sufficient to establish the element of purposefulness. *State v. Esparza* (1988), 39 Ohio St.3d 8, 14. Intent need not be proven by direct testimony. *State v. Lott* (1990), 51 Ohio St.3d 160, 168. Instead, an intent to kill "may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." *State v. Robinson* (1954), 161 Ohio St. 213, paragraph five of the syllabus. Here, Eley entered the market with a loaded gun and fired it at Aydah when it appeared that Aydah was reaching for a gun that Green had told him

> was kept under the counter. Eley's self-serving statement that he was trying to shoot Aydah in the shoulder supports Eley's preferred interpretation as to his intent. However, the evidence and surrounding circumstances strongly support the panel's conclusion that Eley intended to kill Aydah, since the shot allegedly intended for his shoulder struck him in the upper part of his head. Under the evidentiary test outlined in *Jenks, supra*, there was sufficient evidence to convict Eley of aggravated murder.

*State v. Eley*, 77 Ohio St.3d at 179-80 (parallel citations omitted).

The Ohio Supreme Court cogently analyzed the evidence presented during trial.  It held under *Jackson* a rational factfinder could conclude Eley intended to kill Aydah because he entered the market with a loaded gun.  Additionally, the court found, despite Eley's protestations, a rational factfinder could conclude based on the fact that Aydah was shot on the upper part of his head, Eley intended to kill Aydah.  The Sixth Circuit has held "the manner in which a wound is inflicted can support an inference of a purpose to kill, which can be used to find specific intent."  *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001).  The Ohio Supreme Court's holding was an unreasonable application of *Jackson*.  Eley's fifth claim for relief lacks merit.

**6.    The statements Eley provided to police officials were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments.  The admission of said statements violated the guarantees contained in *Miranda v. Arizona*, 384 U.S. 436 (1966).**

Eley maintains the police who questioned him while in custody violated his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), because Eley had ingested significant amounts of alcohol and prescription drugs prior to making the statements and, thus, his waiver of his *Miranda* rights was not knowing, voluntary, and intelligent.  Defense counsel filed a motion to suppress Eley's confession, asserting his *Miranda* waiver was invalid.  The trial court thereafter held a suppression hearing on this issue, but denied Eley's motion.  Eley

40

raised this claim as his third proposition of law to the Ohio Supreme Court.  Thus, it is ripe for habeas review and the Court will address it on the merits.

Although *Miranda* requires custodial investigations may not take place without informing the accused of his right to retain counsel before interrogation, the accused may waive those rights if that waiver is knowing, voluntary, and intelligent.  *North Carolina v. Butler*, 441 U.S. 369, 374 (1979).  "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  *Id.* at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

On appeal, the Ohio Supreme Court determined, pursuant to *Miranda* and its progeny, Eley had voluntarily waived his *Miranda* rights.  That court stated:

> In Proposition of Law III, Eley contends that his confession to police was the product of his drug and alcohol intoxication, as well as psychological coercion and the manipulative actions of Youngstown police officers. Eley asserts that because of his intoxication at the time of his arrest, he lacked the capacity to comprehend the nature of his right against self-incrimination and the consequences of waiving it. In addition, Eley argues that he lacked the intelligence to voluntarily waive his constitutional rights.
>
> During the suppression hearing, both Eley and Carlotta Skinner, with whom he was staying at the time of his arrest, testified that Eley had consumed large quantities of Valium, sleeping pills and alcohol during the two-day period leading up to his arrest. As a result, Eley claims to remember very little about the events subsequent to his arrest when he confessed to the crimes.
>
> Defense witness Dr. Russell Morrison, a physician, testified that combining alcohol with the drugs Eley allegedly ingested would prolong the effect and deepen one's state of sedation. However, Morrison also stated that ingesting the quantity of alcohol and drugs allegedly consumed by Eley could put a person near death.
>
> The testimony of the three officers who interrogated Eley weakens defense arguments under this proposition. Detective Fajack stated that he did not notice

41

anything that would indicate that Eley was under the influence of any medication, drugs, or stimulants. Detective Robert Kane testified that Eley told Fajack at the time of the confession that he (Eley) wanted to tell his side of the story of what happened at the Sinjil Market. Detective Pasquale felt that Eley understood the questions posed to him by Fajack.

Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues. However, both are measured by the "totality of circumstances" standard. *State v. Clark* (1988), 38 Ohio St.3d 252, 261. Evidence of police coercion or overreaching is necessary for a finding of involuntariness, and not simply evidence of a low mental aptitude of the interrogee. *State v. Hill* (1992), 64 Ohio St.3d 313, citing *Colorado v. Connelly* (1986), 479 U.S. 157, 164.

Here, there is no evidence that the police subjected Eley to threats or physical abuse, or deprived him of food, sleep, or medical treatment. *See State v. Cooey* (1989), 46 Ohio St.3d 20, 28. The transcript from the suppression hearing reveals no hint or allegation of coercive activity by the police, either in the testimony elicited from the officers or in Eley's testimony. Also, the time between Eley's arrest and confession was not lengthy, as the two events took place less than two hours apart. According to Detective Pasquale, the whole interrogation process with Eley encompassed "roughly an hour." *See State v. Smith* (1991), 61 Ohio St.3d 284, 288.

Eley testified at the suppression hearing that he understood his constitutional rights prior to giving his confession to the police. Moreover, evidence of a written waiver form signed by the accused is strong proof that the waiver is valid. *Clark, supra*, 38 Ohio St.3d at 261, citing *North Carolina v. Butler* (1979), 441 U.S. 369, 375-376.

Under the totality of the circumstances, we conclude that Eley made a knowing, voluntary, and intelligent waiver of his constitutional rights, and that his confession to police was voluntarily made. Eley's claims of heavy drug and alcohol intoxication are inconsistent with the testimony given by the police officers, nor do they appear to be credible in view of Dr. Morrison's testimony at the suppression hearing. *See State v. Fanning* (1982), 1 Ohio St.3d 19, 20 (weight of the evidence and credibility of witnesses are primarily for trier of fact). Accordingly, we overrule Proposition of Law III.

*State v. Eley*, 77 Ohio St.3d at 177-78 (parallel citations omitted).

In his Petition, Eley urges this Court to reconsider the facts.  As stated above,

42

however, the Court, pursuant to the AEDPA, must presume the state court finding of fact is correct, unless the petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  "This presumption of correctness applies even to factual findings made by a state court of appeals based on the state trial record."  *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001)(citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)).  Eley's briefs merely repeat the facts presented to the trial court during the suppression hearing.  Without more evidence, the Court must find that Eley has failed to surmount the presumption of correctness of the state court's factual findings.  Therefore, his sixth claim for relief is without merit.

**7.     Petitioner Eley's convictions or sentences, or both, are void or voidable due to numerous acts of deficient and ineffective assistance of counsel during the culpability phase of trial.**

**8.     Petitioner Eley's convictions and sentences are void or voidable because he was denied effective assistance of counsel during the penalty phase as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.**

Eley's seventh and eighth claims for relief are that defense counsel provided constitutionally ineffective assistance during both phases of the trial in violation of his Sixth and Fourteenth Amendment rights.  Eley had enumerated several instances of alleged ineffective assistance of counsel during the culpability phase of trial, but because he could not argue successfully that they were not procedurally defaulted, Eley withdrew these claims in his Traverse.  *See* Traverse at 3.  Thus, the only culpability phase ineffective assistance claim Eley alleges is trial counsel were ineffective for failing to investigate Melvin Green's alleged statement that he actually shot Aydah.  In addition to asserting this ineffective assistance claim, Eley also asserts counsel were ineffective during the mitigation phase of trial for failing to investigate and present mitigating evidence.  The Court reviews the defaulted status

43

and merits of these claims below.

To assert a successful ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   First, the petitioner must demonstrate counsel's errors were so egregious "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  Second, the petitioner must show he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*

A petitioner must point to specific errors in counsel's performance.  *United States v. Cronic*, 466 U.S. 648, 666 (1984).   Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  A reviewing court must strongly presume counsel's conduct was reasonable and might be part of a trial strategy.  *Id.* at 689.   "'Judicial scrutiny of a counsel's performance must be highly deferential'" and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  *Cone v. Bell*, 535 U.S. 685, 698 (2002)(quoting *Strickland*, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus[] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v.*

44

*Fretwell*, 506 U.S. 364, 372 (1993).

### 1. Ineffective Assistance of Counsel During Culpability Phase of Trial

Eley complains counsel were ineffective for failing to investigate a statement one of his close relatives claimed he heard Eley's co-defendant, Melvin Green make.  In that statement, Eley's cousin, Butch Bankhead, asserts Green admitted he was actually Aydah's killer and Eley was a "stand-up" guy for refusing to implicate Green in the murder.  Although the Respondent initially asserted this claim was procedurally defaulted, she later conceded Eley had preserved this claim for habeas review because he raised it in his state post-conviction petition.  Thus, the Court will review it on the merits.

When reviewing this claim on appeal from Eley's post-conviction proceedings, the Seventh District Court of Appeals found it to be without merit.  It stated:

> Next, Eley alleges counsel failed to properly investigate and interview witnesses who purportedly would have testified "Melvin Green told them that he shot the victim and Eley was being a 'stand-up guy' for not testifying against him". In support of this argument, Eley has attached as Exhibit # 23 an affidavit from his cousin Butch Bankhead who claims Melvin Green "personally" confessed to the shooting.
>
> There are several problems with this argument. First, it is not readily apparent by Butch Bankhead's statement at what point in time Melvin Green allegedly made his so-called "confession". If Green made this statement sometime after the trial, it would be irrelevant to Eley's post-conviction relief petition. Pursuant to R.C. 2953.21, a defendant will only be entitled to relief for constitutional violations occurring at the time of trial and conviction. Consequently, only evidence that could have been discovered by counsel at the time of the trial may be considered when reviewing this claim. Secondly, this statement constitutes double hearsay elicited from a close family member. Eley fails to explain why his cousin did not come forward sooner or why Eley did not suggest to trial counsel that his entire family be questioned. Lastly, it is not apparent that, by calling Butch Bankhead as a witness, the outcome of the trial would have been any different. Eley had already confessed to the crime and refused to implicate his accomplice Melvin Green. Consequently, counsel did not prejudice Eley by not calling Butch Bankhead.

*State v. Eley*, No. 99 CA 109, 2001 WL 1497095, at *8 (Ohio Ct. App. Nov. 6, 2001). The Court of Appeals did not unreasonably apply *Strickland* in finding counsel were not ineffective for failing to investigate this alleged statement. As the Court of Appeals noted, Eley did not explain to that court when Green allegedly made these statements to Bankhead. If he did not make these statements until after the trial was completed, as the Court of Appeals observed, counsel could not have been ineffective for failing to investigate them. Eley has done nothing to further explain the origin of these comments in his habeas proceeding. Without this essential information regarding when Green allegedly made the statements, the Court cannot find the appellate court was unreasonable for finding counsel's inaction in this instance did not constitute unreasonable behavior. Moreover, the appellate court's reasoning that the statements may not have been admissible because of hearsay problems further supports the reasonableness of counsel's inaction. Finally, as this Court noted above and as the appellate court noted in its opinion, Eley confessed to the crime and, even though he was offered a plea bargain by the prosecution in exchange for his testimony against Green, Eley refused to accept the offer because he did not want to implicate Green in the shooting. Thus, it is unlikely the outcome of the trial would have been different even if counsel had explored Bankhead's statement. This sub-claim is not well-taken.

### 2. Ineffective Assistance During Penalty Phase of Trial

In this claim, Eley contends he received ineffective assistance of counsel during the penalty phase of trial. He argues that his counsel were deficient in several respects. First, he argues counsel did not adequately prepare for and present evidence during the mitigation hearing. Had counsel done so, Eley insists, the trial court would have heard evidence

regarding his troubled upbringing, his alcohol and drug dependence, as well as evidence about his education and employment background.  Additionally, Eley maintains, counsel failed to elicit testimony that revealed his remorse for his actions.  Eley also claims counsel were ineffective for failing to move the trial court for the appointment of a pharmacologist, a toxicologist, and for an independent psychologist to evaluate him.[20]

The Respondent asserts all of Eley's sub-claims are procedurally defaulted because he failed to raise them on direct appeal.  Because these sub-claims were based on evidence contained in the trial record, the Respondent argues, they are barred on ground of *res judicata*, as described above.  Eley raised these claims for the first time in his post-conviction petition.  The post-conviction trial court held that the claims were barred because Eley should have raised them on direct appeal.  Although some of the sub-claims arguably were based on evidence outside the record, this Court will follow the post-conviction court's holding and find the claims are procedurally defaulted.

Out of an abundance of caution, the Court also examines these claims on the merits but, for the reasons stated below, finds they are not well-taken.  The United States Supreme Court has expounded on the *Strickland* standard relative to claims trial counsel failed to investigate and present mitigating evidence regarding a defendant's background.  In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court held counsel's failure to investigate and present to the jury mitigating evidence was unreasonable.  There, the Court held trial counsel's failure to

---

[20]    In his Petition, Eley also asserted counsel were ineffective for requesting a pre-sentence investigation report and for failing to move the court for the appointment of a defense neurologist.  Eley withdrew these claims in his Traverse.  *See* Traverse at 48.

discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[21]

The Court found counsel's decision not to expand their investigation in the wake of reviewing

several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's

placement in several foster homes was an abdication of the duties imposed on counsel

pursuant to *Strickland*.

The *Wiggins* Court cautioned, however, "a court must consider not only the quantum

of evidence already known to counsel, but also whether the known evidence would lead a

reasonable attorney to investigate further." *Id.* at 527.  While *Strickland* established strategic

decisions generally are not subject to challenge, the *Wiggins* Court emphasized these

decisions are not immune from attack if they are founded upon an unreasonable investigation.

*Id.*  Finding the information the petitioner's trial counsel already had reviewed triggered a

duty to investigate the petitioner's background further, the Court held trial counsel's actions

were objectively unreasonable under *Strickland*.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court

must determine "whether there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Rompilla v.*

*Beard*, 545 U.S. 374, – , 125 S.Ct. 2456, 2467 (2005)(internal quotation marks and citations

---

[21]    The Court noted the extensive hardships the petitioner faced during childhood:
> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins
> and his siblings home alone for days, forcing them to beg for food and to
> eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included
> beating the children for breaking into the kitchen, which she often kept
> locked.  . . .  Petitioner's first and second foster mothers abused him
> physically and . . . the father in his second foster home repeatedly
> molested and raped him.

*Id.* at 516-7 (citations omitted).

omitted); *Dickerson v. Bagley*, 453 F.3d 690 (N.D. Ohio 2006).

Following the *Wiggins* Court's example, the Sixth Circuit held in *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003), courts must review trial counsel's actions in light of the American Bar Association's guidelines.  Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and employment history, as well as obtaining a family and social history through, *inter alia*, contact with family members.  Id. at 487 n.2. The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . . .  ." *Id.*

The main thrust of Eley's ineffective assistance of counsel during mitigation claim arises from counsel's failure to investigate potentially mitigating evidence and present it during the penalty phase of trial.  He also claims counsel should have procured a pharmacologist, a toxicologist, and a defense psychologist.  To assess the validity of these allegations, the Court must begin with the mitigation strategy as is apparent from the mitigation evidence that counsel presented during trial.  Counsel first called three law enforcement officials, one from the Mahoning County Jail, and two Youngstown Police Department personnel who had contact with Eley during his arrest and trial.  Sergeant Walter Charko stated Eley had not violated any rules or regulations while at the Mahoning County Jail.  Both Lieutenant Robert Kane and Detective Joseph Fajack, who witnessed and memorialized Eley's confession, testified Eley appeared remorseful while he admitted responsibility for his actions.

Cecilia Joseph, Eley's mother, and Susan Laury, Eley's sister, both testified about

Eley's difficulties in school and placement in "special classes" and his subsequent frustration when children teased him about his learning difficulties.  Joseph stated that at age sixteen, Eley decided to drop out of high school.  Eley then enlisted in the Job Corps and received training to become a welder.  While earning money from the Job Corps, Joseph and Laury testified Eley sent money to his mother so that she could pay for and receive a degree in nursing.  Eley's brother-in-law, William Carter, testified Eley was encouraging to one of his children who had a learning disability.

Both Joseph and Laury also testified about Eley's poor relationship with his father and step-father.  Joseph stated Eley's father did not continue seeing Eley once she and Eley's father divorced, when Eley was around fourteen years old.  Additionally, Joseph and Laury described an incident that occurred one Christmas day in which Joseph's second husband, Eley's step-father, became violent with Laury and Joseph.  Eley attempted to stop his step-father from strangling his mother by stabbing him.  Joseph stated Eley was "church oriented" and regularly attended a church near his home.  Joseph and Laury also testified about Eley's habitual use of alcohol and drugs.  Laury stated Eley was typically a quiet, sweet, gentle person but he would become a different person after consuming alcohol or drugs.  Although testifying for the State, Dr. Darnell testified during cross-examination Eley had a chronic history of both alcohol and polysubstance abuse.

On appeal from post-conviction proceedings, the Seventh District Court of Appeals held that Eley's counsel provided him constitutionally effective assistance of counsel.  It opined:

> Eley states "[t]rial counsel was ineffective for failing to investigate and talk to people who would have testified regarding Petitioner's extensive alcohol and

drug abuse history, his lack of treatment for his addictions, and to more fully
present the extreme alcohol and drug abuse by Petitioner prior to the crime and
prior to his arrest and statement to the police." Eley has attached numerous
affidavits given by his family and friends to support this contention.

It is the obligation of counsel to make reasonable investigations or to make a
reasonable decision that makes specific investigations unnecessary. A
particular decision not to investigate must be examined for reasonableness
under the circumstances with strong measures of deference to counsel's
judgments. *Strickland, supra*. The failure of trial counsel to call a witness is a
decision concerning trial strategy, and, absent a showing of prejudice, such
failure does not deprive a defendant of ineffective assistance of counsel. *State
v. Reese* (1982), 8 Ohio App.3d 202, 203.

* * * At Eley's sentencing hearing, the following was submitted by counsel as
mitigating evidence: 1) Eley came from a dysfunctional family; 2) despite this,
he established positive relationships with other family members; 3) he suffers
from chronic alcoholism and polysubstance abuse and related blackouts, which
caused him to act out impulsively; 4) he exercises poor judgment with
minimum control of his behavior; 5) he suffered head injuries as a teenager; 6)
he has behaved well while incarcerated and has undergone a religious
conversion, and; 7) Melvin Green, the instigator and planner of the crimes, has
gone unpunished. *Eley*, 77 Ohio St.3d at 185.

It is well settled that when a defendant presents evidence de hors the record
that is cumulative of, or alternative to, material presented at trial, the court may
properly deny a hearing. *State v. Combs* (1994), 100 Ohio App.3d 90, 98 citing
*Powell, supra*, at 270. Here, a quantum of information contained in the
affidavits appears to be repetitive of evidence presented by trial counsel at the
mitigation stage. New evidence, for example, the claim that Eley was a forceps
delivery, is of the type that would normally be rejected by three judge panels
when weighing mitigating factors.

* * *

Consequently, as Eley has shown no prejudice, this assertion lacks merit.

*State v. Eley*, No. 99 CA 1497095, 2001 WL 1497095, at *9 (Ohio Ct. App. Nov. 6, 2001).

The appellate court's finding Eley could not establish prejudice is not an unreasonable

application of *Strickland* and its progeny.  As the Sixth Circuit held in *Lorraine v. Coyle*, 291

F.3d 416 (6th Cir. 2002), a habeas petitioner is not entitled to relief based on an ineffective

assistance of counsel claim unless he or she can prove counsel's alleged failures prejudiced the outcome of the state court proceeding.  In that case, the petitioner alleged counsel were ineffective for failing to investigate and present mitigating evidence.  On habeas review, the district court found ineffective assistance based on trial counsel's failure to develop evidence of the petitioner's organic brain damage.  *Id.* at 434.  The Sixth Circuit reversed, holding the petitioner failed to demonstrate trial counsel's failure to investigate prejudiced the outcome of the penalty phase when habeas counsel could find no evidence the petitioner was actually brain damaged.  *Id.* at 436.  *See also Martin v. Mitchell*, 280 F.3d 594 (6th Cir. 2002)(finding counsel not constitutionally ineffective for failing to present mitigating evidence when counsel did present some, albeit non-exhaustive, evidence in mitigation and petitioner failed to demonstrate prejudice); *Williams v. Coyle*, 260 F.3d 684 (6th Cir. 2001)(same).

Here, as in the above cited cases, Eley cannot demonstrate that any of counsel's alleged failures prejudiced the outcome of his mitigation proceedings.  Indeed, the vast majority of the evidence Eley asserts counsel should have been presented during the penalty phase was, in fact, adduced during trial.  Counsel elicited testimony regarding Eley's upbringing, education and employment history, his drug and alcohol addictions and his religious beliefs and model behavior in prison.  The information Eley asserts counsel omitted, such as the fact that he was a forceps delivery is, as the court of appeals court held, unlikely to have influenced the panel's sentencing decision.  Because Eley does not demonstrate that counsel's investigation and presentation of mitigating evidence prejudiced the outcome of Eley's mitigation proceedings, this sub-claim is not well-taken.

Eley's assertions that counsel were ineffective for failing to move the trial court for

the appointment of a pharmacologist, a toxicologist, and a defense psychologist suffer from a similar defect.  Although Eley raises these sub-claims in the Petition, he fails to elaborate why counsel's failures prejudiced the outcome of the penalty phase of trial.  Without more specific information to demonstrate that Eley can fulfill the second *Strickland* requirement, the Court finds these sub-claims lack merit.  *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)("If [a petitioner] fails to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims must fail.")(quoting *Strickland*, 466 U.S. at 697).

**9.      Petitioner Eley's convictions or sentences, or both, are void or voidable because the death penalty is disproportionately meted out to those defendants who are racial minorities or those defendants who are accused of killing white victims, or both.**

The Court will not review this claim because Eley withdrew it in his Traverse.  *See* Traverse at 3.

**10.     The three judge panel improperly excluded consideration of lesser included offenses to the capital homicide by improperly invoking an "acquittal-first" procedure during the culpability phase of the Petitioner's trial.**

The Court will not review this claim because Eley withdrew it in his Traverse.  *See* Traverse at 3.

**11.     Ohio's definition of reasonable doubt is violative of the Constitution as it allows the Petitioner to be convicted with evidence below the degree of proof required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In this claim Eley takes issue with Ohio's definition of reasonable doubt.  He contends it allows a factfinder to convict a criminal defendant on a standard of proof that is less than what the Constitution requires.  This claim is without merit.  The Sixth Circuit has found that Ohio's statutory definition of reasonable doubt, the definition utilized by the trial court, is

constitutional.[22]  *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000)(citing *Thomas v. Arn*, 704 F.2d 865, 867-69 (6th Cir. 1983)).  To offend due process, the instruction must be of the type that could mislead a factfinder into finding no reasonable doubt when in fact there was some. *Holland v. United States*, 348 U.S. 121, 140 (1954); *Thomas*, 704 F.2d at 868.  In the present case, the trial court utilized the statutory definition the Sixth Circuit has found to be constitutional.  Thus, this claim is not well-taken.

**12.     The State of Ohio's purported proportionality review is "ethically indefensible."**

Eley's twelfth claim for relief is that the Ohio Supreme Court did not conduct a constitutionally adequate proportionality review.[23]  Specifically, Eley claims the Ohio Supreme Court improperly excludes cases in its review in which the State sought the death penalty but did not receive it.

A proportionality review is not constitutionally required.  *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984).  *See also McQueen v. Scroggy*, 99 F.3d 1302, 1333–34 (6th Cir. 1996), *overruled on other grounds by*, *Abdur'Rahman v. Bell*, 392 F.3d 174 (6th Cir. 2004)("There is no federal constitutional requirement that a state appellate court conduct a comparative

---

[22]     That statute reads:
> "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge.  It is a doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.  "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

Ohio Rev. Code § 2901.05(D).

[23]     Eley raised this claim on direct appeal to the Ohio Supreme Court but that court summarily rejected it.  *State v. Eley*, 77 Ohio St.3d 174, 186 (1996).

proportionality review."). By statute, however, Ohio requires the appellate courts to engage in a proportionality review. Under Ohio Revised Code § 2929.05(A):

> In determining whether the sentence of death is appropriate the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

Ohio Rev. Code § 2929.05(A).

Because Ohio law requires appellate courts to engage in a proportionality review, the review must be consistent with constitutional requirements. *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 899 (E.D. Ky. 1988), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1990)(citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). Nonetheless, when the state courts have engaged in a proportionality review, the federal habeas court's review is limited. The habeas court examines the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." *Id.* (citing *Moore v. Balkcom*, 716 F.2d 1511, 1517 (11th Cir. 1983)). *See also Spinkellink v. Wainwright*, 578 F.2d 582, 604 (5th Cir. 1978), *cert. denied*, 440 U.S. 976 (1979)(same).

In *Spinkellink*, the petitioner argued

> that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences. All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he.

*Moore*, 716 F.2d at 1517–18 (quoting *Spinkellink*, 578 F.2d at 604). The court "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the [state] judicial system." *Id.* (citing *Spinkellink*). It held:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Id.* Moreover, when examining an Ohio capital conviction on habeas review, the Sixth Circuit has stated because "proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison." *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001). Because Eley's death sentence does not "shock the conscience," this claim is not well-taken.[24]

**13.** **The effect of cumulative error during the trial deprived Petitioner Eley of a fair trial.**

Eley asserts that he is entitled to habeas relief based on cumulative errors that occurred during his state court proceedings. The Court finds it is foreclosed from reviewing

---

[24] Recently, the Sixth Circuit reversed a death sentence on proportionality grounds, finding the disparity between the life sentence a defendant received in a murder for hire trial was disproportionate to the death sentence the actual killer received. *Getsy v. Mitchell*, 456 F.3d 575 (6th Cir. 2006). It concluded the petitioner's death sentence, "while the arguably more culpable [murder for hire defendant] received a life sentence for the *very same* crime, violates the Eighth Amendment, as construed by the Supreme Court in *Furman [v. Georgia*, 408 U.S. 238 (1972)] and *Enmund [v. Florida*, 458 U.S. 782 (1982)], and its prohibition of arbitrary and disproportionate death sentences." *Id.* at 587 (emphasis in the original). Because Eley did not raise a proportionality claim based on the disparity between his conviction and sentence and Green's acquittal, the Court will not address Eley's proportionality claim pursuant to the *Getsy* holding.

these claims pursuant to the strictures of the AEDPA.  As the Sixth Circuit has held, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."  *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *and cert. denied at*, 538 U.S. 947 (2003).[25]  *See also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006)(following *Lorraine* and holding while errors might accumulate to produce unfair trial setting, Supreme Court has never held distinct claims can accumulate to grant habeas relief); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)(same).  Accordingly, Eley is not entitled to relief for this claim.[26]

**14.    Eley's convictions and sentences are void or voidable because he was convicted and sentenced to death pursuant to [the Ohio death penalty statutes], which are all unconstitutional, both on their face and as applied.**

Eley's final claim for relief is aimed at the structure of Ohio's capital punishment scheme.  He asserts Ohio's capital punishment scheme is unconstitutional on its face.  The Court will address each sub-claims but is not persuaded by any of Eley's allegations.  In summary fashion, the Court will list below these allegations, in italics, and thereafter state the reasons they are unpersuasive.

•    *The death penalty violates the Eighth Amendment prohibition against cruel and unusual punishment.*  This argument was rejected in *Gregg v. Georgia*, 429 U.S. 875 (1976)(holding death penalty *per se* not constitutionally barred).

---

[25]    The Court acknowledges in a subsequent case, the Sixth Circuit granted habeas relief on cumulative error grounds.  *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003).  Because the *DePew* petitioner had filed his petition prior to the AEDPA's effective date, however, the AEDPA provisions did not apply.  *Id.* at 748.

[26]    In his Motion for disclosure of Supplemental Authority as to Claim 13 (Cumulative Error), (ECF DKT # 61), Eley concedes this Court is bound by the *Moore* holding.

- *Ohio's scheme is not the least restrictive means of effectuating deterrence.*  The United States Supreme Court addressed this exact point in *Gregg v. Georgia*, 428 U.S. 153 (1976).  Noting that imposing criminal punishment is a legislative responsibility, the Court limited its own ability to "require the legislature to select the least severe penalty possible."  *Id.* at 175.

- *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial discretion to determine whether to seek a capital indictment.*  Once again, the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

- *Ohio's scheme is unconstitutional because it fails to require the jury to find the offender killed with premeditation and deliberation.*  This argument is groundless as Ohio Revised Code  § 2903.01(A) states "[n]o person shall purposely, and with prior calculation and design, cause the death of another."

- *Ohio's scheme is unconstitutional because it fails to establish a standard for determining the existence of mitigating factors.*  While the United States Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," *Gardner v. Florida*, 420 U.S. 349, 361 (1977), there is no actual criterion stating that the trial judge or jury must identify and articulate the specific factors used to formulate the decision.  Furthermore, Ohio Revised Code § 2929.03(F) requires a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors.  By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness."  *State v. Buell*, 22 Ohio St.3d 124, 138 (1986), *cert. denied*, 479 U.S. 871 (1986).  Thus, no constitutional infirmity exists.

- *Ohio's scheme is unconstitutional because it fails to set a standard of proof for the jury for the balancing of mitigating factors with aggravating circumstances.*  The United States Supreme Court has determined that a state is not required to give the jury guidance as to its weighing and consideration of the evidence adduced during the mitigation phase.  *Buchanan v. Angelone*, 522 U.S. 269 (1998).

- *Ohio's scheme is unconstitutional because one of the aggravating circumstances merely repeats an element of the crime and fails to narrow the class of death-eligible defendants.*  The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty.  In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Court held any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant.  Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence.  *Id.* at 605.

The Court further refined the statutory limiting requirement in *Zant v. Stephens*, 462 U.S. 862 (1983).  In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible.  *Id.* at 177.  Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase.  *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1987).

Ohio's death penalty scheme complies with these mandates.  First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors.  Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute.  Finally, the Ohio death penalty scheme satisfies the *Zant* requirements by demanding that the fact finder find the existence of at least one aggravating circumstance set forth in § 2929.04(A) before imposing the death penalty.

- *Ohio's scheme is unconstitutional because it pressures capital defendants into pleading guilty rather than exercising their right to trial.*  In *United States v. Jackson*, 390 U.S. 570, 582 (1996), the Supreme Court determined a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial.  In that case, the Court struck down the capital portions of a federal kidnaping statute because it authorized only the jury to impose the death sentence.  Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial."  *State v. Buell*, 22 Ohio St.3d 124, 138 (1986).  Consequently, Ohio's scheme comports with constitutional mandates.

- *Ohio's scheme creates a mandatory death penalty.*  Without further explanation as to the nature of this claim, the Court cannot address it.

- *Ohio's scheme permits the State to argue first and last in the mitigation phase of trial.*  Even if this sequence does place a capital defendant at a disadvantage, and the Court does not so find, this fact does not implicate a constitutional violation.  As long as a state requires the prosecution to prove the existence of all aggravating circumstances, the defendant's constitutional rights are not violated.  *Walton v. Arizona*, 497 U.S. 639, 649-51 (1990).  This aspect of the *Walton* holding is unaltered by the Supreme Court decision *Ring v. Arizona*, 536 U.S. 584 (2002).

- *Ohio's death penalty is applied in an arbitrary and capricious manner.*  Other than bald assertion, Eley cites no specifics about the Ohio statutory scheme that substantiates his argument.  More importantly, Eley does not state why the Ohio courts' application of the death penalty statutes runs afoul of United States Supreme Court jurisprudence.

- *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be*

59

*submitted to the jury once the defendant requests it.* Although the Fifth Amendment would be violated if a court *ordered* a defendant to undergo a psychiatric examination without informing the defendant that his statements can be used against him and then admitted his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, *see Estelle v. Smith*, 451 U.S. 454 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself. This reasoning is explained in *Buchanan v. Kentucky*, 483 U.S. 402 (1987):

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Id.* at 422-23 (citations omitted).

- *Ohio's scheme is unconstitutional because a three-judge panel is not required to identify and articulate the existence of mitigating factors and aggravating circumstances.* While the Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," *Gardner v. Florida*, 420 U.S. 349, 361 (1977), there is no actual criterion stating the trial judge must identify and articulate the specific factors used to formulate the decision. Furthermore, Ohio Revised Code § 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors. By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness." *State v. Buell*, 22 Ohio St.3d 124, 137 (1986), *cert. denied*, 479 U.S. 871 (1986). Thus, no constitutional infirmity exists.

- *Ohio's scheme is unconstitutional because it provides an inadequate proportionality review.* The Court addressed this argument in Eley's twelfth claim for relief. The Court will not readdress it here.

- *Ohio's scheme is unconstitutional because it is imposed in a racially discriminatory manner.* Eley alleges those who are racial minorities or who kill whites are more likely to receive the death penalty. Pursuant to *McClesky v. Kemp*, 481 U.S. 279 (1987), a capital defendant cannot evade a death sentence merely by demonstrating the statistical disparity of capital defendants or victims of a particular race. Instead, the capital defendant must prove the decision maker in his or her individual case acted

with a discriminatory purpose, and such actions had a discriminatory effect on the proceeding. *Id.* at 292. As Eley has not asserted discrimination occurred during his sentencing, this claim must fail.

- *Ohio's scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.* No such constitutional mandate exits. Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

- *Ohio's scheme is unconstitutional because it fails to require that the State prove the absence of any mitigating factors.* This argument was specifically rejected in *Walton v. Arizona*, 497 U.S. 639, 649–50 (1990). There the Court held a death penalty scheme requiring the defendant to establish mitigating factors by a preponderance of evidence is constitutionally acceptable burden shifting. This aspect of the *Walton* holding is unaltered by the Supreme Court decision *Ring v. Arizona*, 536 U.S. 584 (2002).

- *Ohio's scheme is unconstitutional because the defendant must prove the existence of mitigating factors by a preponderance of evidence.* This argument is addressed in the previous claim. The Court will not re-address it.

### VIII. <u>Conclusion</u>

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Eley's claims. The Sixth Circuit Court of Appeals has determined neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Eley presented in his petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

61

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  *Id.* at 483.   Thus, the Court determined

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

*Id*. at 483–04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the

district court's decision "debatable or wrong."  *Id.* at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*  (emphasis supplied).

After taking the above standard into consideration, the Court finds two issues arguably merit further review.  The Court discusses each claim and its defaulted status below.

No reasonable jurist would debate the Court's finding that sub-claim seven of claim one and claim thirteen (cumulative error) are procedurally defaulted because they were never raised in state court at any point in Eley's state court proceedings.  Thus, no COA will issue for those claims.

The Court will not issue a COA for the remaining sub-claims of claim one (failure of three-judge panel to consider mitigating factors) because reasonable jurists would agree with this Court that a habeas court should not re-weigh a sentencing panel's decision.  Because Eley fundamentally asks this Court to perform this task by claiming the panel did not adequately consider mitigating evidence, the Court denies a COA for this claim.

Conversely, the Court finds that jurists of reason could debate its decision regarding Eley's second ground for relief (Eley's competence to stand trial).  While the Court found Eley did not present significant indicia of incompetence to find the trial court should have spontaneously held a hearing on this issue, a reasonable jurist could conclude Eley's refusal to cooperate with Dr. Darnell and undergo a psychological evaluation was such an indication.

Thus, the Court issues a COA for this claim.

No COA will issue for Eley's fifth claim for relief (insufficient evidence of intent to kill).  Other than Eley's self-serving statement, there is no other evidence that suggests Eley merely intended to wound, rather than kill, Aydah.  The Ohio Supreme Court's decision to deny this claim was unequivocally reasonable.

Additionally, the Court finds jurists of reason would not debate the Court's decision to deny Eley's sixth claim for relief (*Miranda* violations).  Like claim one, Eley asks this Court to reconsider the factual findings and conclusions of law made by the state courts.  Without providing this Court with additional evidence to overcome the state court's presumption of correctness for factual findings, the Court must accept those factual findings.  No reasonable jurist would debate this Court's decision on that issue.

The Court will not issue a COA for sub-claim (c) of claim for relief seven (ineffective assistance for failing to investigate Melvin Green statement).  As stated above, Eley does not provide the Court with sufficient detail about the origins of the statement to support an ineffective assistance of counsel claim.  Reasonable jurists would agree with this Court's holding.

Reasonable jurists also would agree a COA is warranted for claim for relief eight (ineffective assistance during the mitigation phase of trial).  While the Court held this claim was procedurally defaulted, a reasonable jurist could hold because the claims were not contained in the trial record, the Seventh District Court of Appeals on appeal from post-conviction relief should not have held they were barred from review on grounds of *res judicata*.  Additionally, although the Court found Eley could not sufficiently demonstrate

prejudice to be entitled to habeas relief pursuant to *Strickland v. Washington*, a jurist of reason could conclude counsel should have introduced additional evidence regarding his drug and familial abuse, his school records, and his employment and educational history.

No COA will issue for claims eleven, twelve and fourteen (insufficient reasonable doubt standard, proportionality review, and unconstitutionality of the death penalty). These claims occur almost *pro forma* in capital habeas petitions but are routinely denied. Reasonable jurists would agree with this finding.

Finally, the Court has observed from prior capital habeas cases counsel for the losing party routinely file a motion for reconsideration. Counsel are advised that attorneys in capital cases are not immune from sanctions where motions are unfounded or are filed for purely tactical reasons unrelated to the merits of the positions taken therein. If counsel file a frivolous motion for reconsideration in this, as in any case, they may be required to reimburse the opposing party for the attorneys' fees and expenses incurred in responding to such motions. *See Davie v. Mitchell*, 291 F.Supp.2d 573, 634 (N.D. Ohio 2003)(Gwin, J.); *Baston v. Bagley*, 282 F.Supp.2d 665, 673 (N.D. Ohio 2003)(Carr, C.J.); *Haliym v. Mitchell*, No. 1:98CV1703, (slip op.) at 158-59 (N.D. Ohio Jan. 20, 2004)(Polster, J.). Where counsel filing an unsuccessful motion for reconsideration are otherwise to be compensated under the Criminal Justice Act, moreover, counsel will not be compensated for the time expended in preparing and filing such motions if this Court finds the motion to be frivolous or asserted solely for purposes of delay.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), an appeal in forma pauperis would not be frivolous and can be taken in good faith.

**IT IS SO ORDERED**

s/Christopher A. Boyko
**CHRISTOPHER A. BOYKO**
**UNITED STATES DISTRICT JUDGE**

DATE: October 18, 2006